

# IN THE
# TENTH COURT OF APPEALS

### No. 10-22-00391-CV

**GREGORY MOLIERE,**

                                                            **Appellant**

 **v.**

**CITY OF BUFFALO, JERROD JONES,**
**MARTIN LEE HOUSLER, MIKE GLICK,**
**WESLEY BRENT REEDER, DIANNA RYDER,**
**AND JERRY SALAZAR,**

                                                            **Appellees**


**From the 278th District Court**
**Leon County, Texas**
**Trial Court No. 21-0294CV**


## MEMORANDUM OPINION


In five issues, appellant, Gregory Moliere, challenges the trial court's granting of

a combined plea to the jurisdiction and motion for summary judgment in favor of

appellees, the City of Buffalo and Jerrod Jones, the Mayor of the City of Buffalo, in a

dispute involving the termination of Moliere's employment as an officer with the City of

Buffalo Police Department.  Because we conclude that a fact issue exists regarding the

authority of the Buffalo City Council to terminate Moliere's employment as a police officer, we reverse and remand.

## Background

Moliere was a police officer with the City of Buffalo Police Department. In the early morning hours of December 8, 2020, Moliere engaged in a high-speed chase while a civilian was riding along in his vehicle. The policies of the City of Buffalo Police Department prohibited Moliere from engaging in a high-speed chase with a ride-along passenger in the vehicle. The high-speed chase resulted in a crash that purportedly caused damage to the police vehicle that Moliere was driving.

In response to the crash, Lloyd Lance Pavelka, the Chief of Police for the City of Buffalo, reprimanded Moliere in writing and placed the written reprimand in Moliere's personnel file. Moliere acknowledged and accepted Chief Pavelka's written reprimand. As stated in Chief Pavelka's affidavit, Moliere did not appeal the written reprimand, and both Chief Pavelka and Moliere considered the disciplinary matter resolved. Chief Pavelka indicated that he had no intention of terminating the employment of Moliere.

On December 21, 2020, with no appeal pending, the Buffalo City Council met in an executive session to discuss Moliere's employment with the City. At the conclusion of the executive session, the Buffalo City Council reconvened in open session and voted to terminate Moliere's employment as a police officer with the Buffalo Police Department. Chief Pavelka, who served as Chief of Police for the Buffalo Police Department for

approximately sixteen years, opined that "[b]efore December 21, 2020, the Buffalo City Council had never voted to terminate a Buffalo Police Officer under my command."

Thereafter, Moliere filed suit, seeking declarations that the Buffalo City Council lacked authority as a Type A general-law municipality to terminate his employment and that the termination of his employment violated the City's policies. In his last amended petition, Moliere named the City of Buffalo, Mayor Jones, and several City Council members as defendants. However, only the City of Buffalo and Mayor Jones were served with Moliere's last amended petition. Thus, the only defendants before the trial court were the City of Buffalo and Mayor Jones.

The City and Mayor Jones filed an original answer generally denying the allegations in Moliere's petition and asserting sovereign or governmental immunity. The City and Mayor Jones then filed a combined plea to the jurisdiction and traditional motion for summary judgment, asserting that they have governmental immunity from Moliere's claims under the Uniform Declaratory Judgments Act and that the City had the authority to terminate Moliere's employment.

Moliere filed a response to the City and Mayor Jones's combined plea to the jurisdiction and traditional motion for summary judgment. He also amended his original petition twice.

After a hearing, the trial court granted the City and Mayor Jones's combined plea to the jurisdiction and traditional motion for summary judgment. In its order, the trial

court concluded that the Buffalo City Council "had the authority to terminate Plaintiff's employment on December 21, 2020." The trial court also dismissed with prejudice, sua sponte, all claims Moliere asserted against other Buffalo City Council members. This appeal followed.

## Standard of Review

Subject-matter jurisdiction is essential to a court's power to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Subject-matter jurisdiction may be challenged by different procedural vehicles, including a plea to the jurisdiction and a motion for summary judgment. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018); *Amboree v. Bonton*, 575 S.W.3d 38, 42-43 (Tex. App.—Houston [1st Dist.] 2019, no pet.). A governmental unit may raise the affirmative defense of sovereign immunity or governmental immunity and challenge the trial court's jurisdiction "through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment." *Clark*, 544 S.W.3d at 770. We review the trial court's ruling on a plea to the jurisdiction and a motion for summary judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323 (Tex. 2006).

Our review of a plea to the jurisdiction challenging the existence of jurisdictional facts mirrors that of a motion for summary judgment. *Mission Consol. Indep. Sch. Dist. v.*

*Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *see Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(c). "[A] court deciding a plea to the jurisdiction . . may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Further, a court may consider evidence as necessary to resolve a dispute over the jurisdictional facts even if the evidence "implicates both the subject[-]matter jurisdiction of the court and the merits of the case." *Miranda*, 133 S.W.3d at 226.

We take as true all evidence favorable to the non-movant and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id.* at 228. If the governmental unit meets its burden to establish that the trial court lacks jurisdiction, the non-movant—here, Moliere—is then required to show that there is a material fact question regarding the jurisdictional issue. *Id.* at 227-28. If the evidence raises a fact issue about jurisdiction, the plea to the jurisdiction cannot be granted, and a factfinder must resolve the issue. *Id.* However, if the evidence is undisputed or fails to raise a fact issue, the plea to the jurisdiction must be determined as a matter of law. *Id.* at 228; *see Garcia*, 372 S.W.3d at 635.

**Sovereign Immunity and the Ultra Vires Exception**

Sovereign immunity protects the State from being sued, and from liability for money damages, unless the immunity has been waived. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 369-70 (Tex. 2009) (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d

371, 374 (Tex. 2006)). Absent waiver, political subdivisions of the state are also entitled to immunity, which is referred to as governmental immunity. *See Reata Constr. Corp.*, 197 S.W.3d at 374. Government officials sued in their official capacities generally have the same immunity as their employer. *See Franka v. Velasquez*, 332 S.W.3d 367, 382-83 (Tex. 2011).

The Uniform Declaratory Judgment Act ("UDJA") is a remedial statute designed "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b). It provides that "[a] person whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the . . . statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004(a). The UDJA, however, "does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature." *Heinrich*, 284 S.W.3d at 370.

Although the UDJA is not a general waiver of immunity, it does waive immunity for certain claims. TEX. CIV. PRAC. & REM. CODE ANN. § 37.006(b); *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011). Specifically, claims brought under the UDJA for declaratory or injunctive relief against actions taken by a governmental official beyond his discretion or without legal authority, known as ultra vires actions, do

not implicate governmental immunity. *See Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). Stated differently, if an act is ultra vires, it is done outside of the powers and responsibilities of the State, and a challenge to the act is not a challenge to the State and its officers in the performance of their duty. *See Heinrich*, 284 S.W.3d at 372. An official who commits an ultra vires act is not immune from suit because "'[a] state official's illegal or unauthorized actions are not acts of the State.'" *Id.* at 370 (quoting *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997)).

To fall within the ultra vires exception, "'a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Houston Belt & Terminal Ry. Co.*, 487 S.W.3d at 161 (quoting *Heinrich*, 284 S.W.3d at 372). "Ministerial acts are those 'where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.'" *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)). On the other hand, discretionary acts require the exercise of judgment and personal deliberation. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425 (Tex. 2004). "[U]ltra vires suits do not attempt to exert control over the state—they attempt to reassert the control of the state." *Heinrich*, 284 S.W.3d at 372. In other words, these suits do not seek to alter government policy but rather to enforce existing policy. *Id.* "[I]t is clear that suits to

require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity." *Id.*

**The Authority of the City of Buffalo to Terminate Moliere's Employment**

In his first four issues, Moliere contends that the City, as a Type A general-law municipality, acted without legal authority when it terminated Moliere's employment and that the Buffalo City Council committed an ultra vires act for which immunity was waived.

"Municipalities are creatures of law that are 'created as political subdivisions of the state . . . for the exercise of such powers as are conferred upon them . . . . They represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Town of Lakewood Village v. Bizios*, 493 S.W.3d 527, 530 (Tex. 2016) (quoting *Payne v. Massey*, 145 Tex. 237, 196 S.W.2d 493, 495 (1946)). "Texas law recognizes three types of municipalities: home-rule municipalities, general-law municipalities, and special-law municipalities." *Id.* (citing *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282, 285 (1948)). "The nature and source of a municipality's power depends on the type of municipality." *Id.* at 531 (citing *Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 658 (Tex. 1995)).

It is undisputed that the City is a Type A general-law municipality. The dispute in this case centers on who has the authority to terminate the employment of a police officer in the Buffalo Police Department. Under section 341.001(a) of the Texas Local

Government Code, "[t]he governing body of a Type A general-law municipality may establish and regulate a municipal police force." TEX. LOC. GOV'T CODE ANN. § 341.001(a). The City asserts that the power to terminate the employment of police officers is an implied power that flows from the authority of the City Council, as the governing body for the City, to establish and regulate a municipal police force under section 341.001(a) of the Texas Local Government Code. *See id.*; *see also Bizios*, 493 S.W.3d at 536. Moliere counters that only the chief of police has the authority to terminate the employment of a police officers in a Type A general-law municipality, unless the municipality passes an ordinance under section 341.001(c) of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 341.001(c) (providing that the "governing body" of a Type A general-law municipality "by ordinance may provide that the police officers serve at the pleasure of the governing body"). As explained below, we believe that a fact issue exists as to who has the authority to terminate the employment of a police officer in the Buffalo Police Department, and as such, the trial court was precluded from granting the City and the Mayor's combined plea to the jurisdiction and traditional motion for summary judgment.

In *Bizios*, the Texas Supreme Court noted that "general-law municipalities have 'only such implied powers as are reasonably necessary to make effective the powers expressly granted. That is to say, such as are indispensable to the declared objects of the [municipalities] and the accomplishment of the purposes of [their] creation.'" 493 S.W.3d at 536 (quoting *Tri-City Fresh Water Supply Dist. No. 2 of Harris County v. Mann*, 135 Tex.

280, 142 S.W.2d 945, 947 (1940)). "A municipal power will be implied only when without its exercise the expressed duty or authority would be rendered nugatory." *Foster v. City of Waco*, 113 Tex. 352, 255 S.W. 1104, 1106 (1923). Therefore, courts "strictly construe general-law municipal authority and '[a]ny fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the [municipality], and the power is denied.'" *Bizios*, 493 S.W.3d at 536 (quoting *Foster*, 255 S.W. at 1106).

Section 341.001 of the Texas Local Government Code is silent on the specific issue of terminating the employment of police officers. *See* TEX. LOC. GOV'T CODE ANN. § 341.001. Furthermore, City has not passed an ordinance providing that the City Council, as the governing body for the City, may terminate the employment of a police officer. However, it is noteworthy that the City has passed an ordinance pertaining to the appointment and hiring of city police officers. Specifically, in Ordinance No. 20180625, which was enacted on June 25, 2018, the City adopted hiring authorization policies and procedures for police officers. Attached to Ordinance No. 20180625 is Exhibit A, which provided that, among other things, the "City Council shall approve the appointment/hiring of all city police officers." Although it addresses the appointment and hiring of city police officers, Ordinance No. 20180625 does not address the discipline or termination of city police officers.

It is arguable that the enactment of Ordinance No. 20180625 is a recognition by the City that it cannot rely on section 341.001(a) "implied powers" with regard to the

appointment and hiring of city police officers. The same is also arguably true for the termination of employment for city police officers. If the City Council wanted to exercise the authority to terminate the employment of city police officers, it could have passed an ordinance under section 341.001(c) of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. § 341.001(c) (providing that the governing body of a Type A general-law municipality may pass an ordinance that city police officers serve at the pleasure of the governing body).

Additionally, we are mindful that courts are to "strictly construe general-law municipal authority and '[a]ny fair, reasonable substantial doubt concerning the existence of power is resolved by the courts against the [municipality], and the power is denied." *Bizios*, 493 S.W.3d at 536 (quoting *Foster*, 225 S.W. at 1106). In the absence of expressed statutory authority or an ordinance addressing the termination of the employment of city officers, we are reluctant to recognize such authority as a section 341.001(a) "implied power."

Furthermore, the City and Mayor Jones attached a copy of the Buffalo Police Department Policy & Procedure Manual Version 1.1 ("Policy & Procedure Manual") to their combined plea to the jurisdiction and traditional motion for summary judgment.[1]

---

[1] The Policy & Procedure Manual indicates that it was presented to the Buffalo City Council and was approved by a unanimous vote on February 9, 2009. However, the manual included in the record was not signed by the Mayor, Chief of Police, or Moliere, nor did the City Secretary certify the document. In any event, the Mayor and City Council refer to this manual in their motion and brief as if it was effective on the date in question.

As stated in the Policy & Procedure Manual, the Chief of Police of the Buffalo Police Department acts "under the direct supervision of the Mayor/City Council." The Policy & Procedure Manual further states that the Chief of Police "[w]ill make recommendations to the Mayor and city council regarding personnel matters," among other things.

Regarding personnel, the Policy & Procedure Manual also provides that:

Nothing in these general orders shall be construed or is intended to alter the at-will status of any employee and no employee or supervisor of the City of Buffalo has the authority to make any statement or take any action which alters the at-will status of any employee or which creates any expectation of future employment.

Also pertinent to our inquiry, the Policy & Procedure Manual states,

Promotions will be recommended by the Chief of Police and approved by the Mayor. Promotional recommendations by the Chief of Police will be made only after, and based upon, an interview of the candidate, an assessment of the candidate's prior job performance and any other quantifiable factors. The Mayor will make the final decisions regarding promotions in the Police Department.

Pursuant to the Policy and Procedure Manual, evaluations are done at the discretion of the Chief of Police; however, an officer who receives an unsatisfactory review that he or she perceives to be unjust may protest to the Chief of Police. The decision of the Chief of Police may then be appealed to the City Council.

Under the Policy & Procedural Manual, discipline of police officers is handled as follows:

C. Level I Infractions

Level I infractions which are classified as sustained are subject to the following types of disciplinary action which can only be assessed by the Chief of Police subject to appeal and approval by the City Council.

1. Written reprimand—Upon request of the employee the form may be removed from the file and destroyed after a period of two years;

2. Suspension;

3. Demotion;

4. Termination.

Disciplinary action involving potential monetary loss by the employee, including suspension, demotion and termination shall only be assessed subsequent to a formal internal investigation and subsequent to the affected employee being given an opportunity to provide any mitigating information.

The Chief of Police may solicit recommendations for disciplinary action as he deems necessary.

In a situation involving emergency relief from duty, suspension, or discharge, the Policy & Procedure Manual states,

1. Any supervisor has the authority to impose emergency relief from duty for an employee until the next business day when it appears that such action is in the best interest of the Department and/or the employee. Whenever an employee is relieved from duty, the Chief of Police shall be immediately notified.

2. Only the Chief of Police has the authority to place an employee on administrative leave with pay.

3. When an employee is temporary relieved from duty, his supervisor shall collect the employee's badge(s), Department issued weapon(s) and police identification card. When an employee is discharged, the supervisor shall ensure that all city-issued property and equipment used by the employee is turned in. In either case, the supervisor shall

forward, through the chain of command, a written report detailing the items that he has collected.

And finally, the Policy & Procedure Manual emphasizes that: "Appeals and grievances may be filed by any employee in accordance with the City of Buffalo Personnel Policies and Procedures. Employees may appeal disciplinary actions of the Chief of Police to the Mayor."

The gist of the Policy & Procedure Manual appears to be that the Chief of Police has sole disciplinary power up to and including termination of the employment of city police officers, although the Chief of Police may consult and receive recommendations from the Mayor or City Council. The City Council's role under the Policy & Procedure Manual appears to be in an advisory capacity to the Chief of Police, as well as an appellate option for a city police officer dissatisfied with the Chief of Police's disciplinary decision.

Despite the foregoing, the record also includes an excerpt from the City of Buffalo Employee Manual, which Moliere signed on June 23, 2020. This manual does not address the day-to-day duties and activities of city police officers. Nevertheless, this manual provides the following:

> THIS EMPLOYEE MANUAL DOES NOT CREATE A CONTRACT OF EMPLOYMENT BETWEEN YOU AND CITY OF BUFFALO.
>
> YOUR EMPLOYMENT WITH CITY OF BUFFALO IS "AT-WILL" MEANING THAT EITHER YOU OR CITY MAY TERMINATE YOUR EMPLOYMENT AT ANY TIME WITH OR WITHOUT CAUSE.
>
> THIS EMPLOYMENT MANUAL SUPERSEDES AND REVOKES ANY PREVIOUSLY ISSUED EMPLOYEEE MANUAL(S) OR HANDBOOK(S).

<u>NO ONE, OTHER THAN THE CITY'S GOVERNING BODY, HAS THE AUTHORITY TO CREATE A CONTRACT OF EMPLOYMENT BETWEEN YOU AND CITY OR TO ALTER THE "AT-WILL" NATURE OF YOUR EMPLOYMENT RELATIONSHIP WITH CITY.</u>

The City of Buffalo Employee Manual purports to supersede and revoke any previously issued employee manuals or handbooks. However, the manual does not specify which manuals are superseded and revoked. Does this apply only to prior iterations of the City of Buffalo Employee Manual? Or does this provision apply the Policy & Procedure Manual that specifically addresses the operations of the City of Buffalo Police Department? If this manual supersedes and revokes the Policy & Procedure Manual, what governs the day-to-day operations of the City of Buffalo Police Department?

Additionally, the City of Buffalo Employee Manual also appears to vest the power to terminate the employment of city employees with the City. The last provision above mentions the power of the City's governing body—presumably, the City Council—with regard to altering the contract of employment. However, the second provision regarding termination of employment merely mentions the City, not the City's governing body or the City Council. In other words, the language used in the City of Buffalo Employee Manual is ambiguous and does not definitively resolve the issue of whether the Mayor or City Council had the power to terminate the employment of Moliere when he did not appeal the written reprimand of Chief Pavelka and where the City of Buffalo Employee

Manual appears to conflict with the Policy & Procedure Manual of the City of Buffalo Police Department.

Taking as true all evidence favorable to Moliere and indulging every reasonable inference and resolving any doubts in his favor, we conclude that a fact issue exists as to whether the City Council had the authority to terminate the employment of Moliere and, thus, was entitled to governmental immunity.  *See Miranda*, 133 S.W.3d at 227-28 (noting that if the evidence raises a fact issue regarding jurisdiction, the plea cannot be granted, and a factfinder must resolve the issue); *see also Houston Belt & Terminal Ry. Co.*, 487 S.W.3d at 158, 161; *Heinrich*, 284 S.W.3d at 370-72.  Accordingly, we sustain Moliere's first four issues on appeal.

## Conclusion

Having sustained Moliere's first four issues on appeal, we need not address his fifth issue.  *See* TEX. R. APP. P. 47.1, 47.4.  We reverse the judgment of the trial court and remand for proceedings consistent with this opinion.



STEVE SMITH
Justice

Before Chief Justice Gray,
    Justice Johnson,
    and Justice Smith
(Chief Justice Gray dissenting without a note.)
Reversed and remanded
Opinion delivered and filed September 28, 2023
[CV06]

